Again, good afternoon everyone. We'll hear oral argument in one council motion. Geller v. Cuomo 20-2561. I understand that council for all the parties are present and so we'll begin with Mr. Yerushalami. You have five minutes. Thank you, your honor. Good afternoon. Subject of course to the court's own inquiries, I'd like to focus on defendant's central substantive defenses in this litigation. Those defenses really boil down into two parts. And in both cases, in order to sustain those defenses, they have to corrupt the factual record and subject themselves to their own internal contradictions specifically. Their first position is not understanding what our eyes see and our ears hear and what the world understands to be a content and viewpoint-based censorship of Plankton Geller's and other similarly-situated protesters, right? The embrace of the BLM protesters. Defendants say, no, no, that's not what's really going on here. Notwithstanding our public statements, notwithstanding our public participation, embracing the message in the protest, what we're really saying and doing here is providing a license to the BLM protesters out of fear that they will turn violent if we actually attempt to enforce our executive orders. Now, the problem of course with that position is twofold, as I had mentioned earlier. One, it's the corruption of the factual record. Nowhere in the factual record have the defendants stated that in fact they aren't embracing the message of the BLM protesters over our client's message, and they're not granting some special license that allows them to go out and protest hopefully peacefully in whatever numbers they wish. That kind of embrace of the message would effectively be a heckler's veto. Judge Nardini, do you have any questions? Yeah, thank you. Mr. Irshami, can I just ask you a couple of questions? Absolutely, your honor. So one of my questions here goes to the standard for issuing the preliminary injunction, and maybe you could just explain a little bit more your view of the state of the record with respect to the risk or likelihood, or however you want to put it, that the city would actually take enforcement action against your client if she were to show up at city hall tomorrow and hold her desired protest with, I don't know, let's say a hundred people, and let's assume for the hypothetical that she were to comply with all the conditions that you said she would comply with, which is everyone would wear masks, everyone would be socially distant, no one would be blocking a roadway. Is it your, well you tell me, what's your view about the state of the record with respect to whether or not there's any sort of likelihood at all that there would be enforcement action taken against her? Well, the state of the record, and this goes to their second defense, or their corollary defense, when they're confronted with the heckler's veto and viewpoint-based discrimination, they then say, well, the reality is we're not only not arresting the Black Lives Matter protesters, we've decided we're not going to even arrest Prince of Delaware or any other similarly situated peaceful protesters. Now the problem, of course, is that's not in the record. What we have in the record are a litany of arrests prior to the Black Lives Matter protesters. We have an expanse authoritative memorandum issued by the police command that says your job when people are protesting in violation of the executive order, the commander's on the on the on the ground, is to issue a disbursement order, and if the disbursement order is not followed after several attempts as a last resort, you arrest the protesters. Now that's the record. So you don't always work on that. Can I just follow up on that? This is helpful. And there may or may not be a dispute about that. Perhaps when we hear from your adversaries, they'll agree with that's the state of play. But if they were to make a representation to this court on the record, that confirms what I think or I had thought the record showed, which is that they were saying that they have now decided not to arrest any peaceful protesters, regardless of viewpoint, whether it's related to racial injustice or protesting COVID or whatever. If they were to make that representation that Ms. Geller were able to engage in her desired protest without any fear of enforcement of the executive order, would that take away at least part of your ability to demonstrate an entitlement to an injunction pending appeal, at least, the likelihood of suffering irreparable harm? If basically the threat of enforcement were taken away? Well, in effect, what they would be doing, Your Honor, is to saying there is no longer any executive order in play or stance. Not quite to say there's no executive order, but if they were to represent that when they have said to us and the district court, we're not arresting anybody. We haven't arrested anyone since the protests commenced in the wake of the Floyd incident, and we're committing that we're not going to resume. It would simply be a non-enforcement representation, not that the executive orders don't exist, but a commitment that they're not a representation, that they're not enforcing it. So short of repealing the executive order, what would your view be if there was such a representation on the record? Well, standing on one leg, as it were, my position would be that if, in fact, it was an authoritative representation, that there would never be an arrest, notwithstanding the fact that the executive order provides for enforcement to arrest, citation arrest, then I would say that the argument of irreparable harm might be subject to a sufficient defense, but here's the problem. Unless they were to say they would authoritatively that they would never enforce, because otherwise we have the problem of voluntary cessation, but if I can just take one step back, if they were to take that position, your honor, it would contradict everything they've said in this litigation and other litigations by similar places, and that would be it's no longer a compelling state interest because the enforcement of this executive order is apparently no longer necessary, and it's certainly not the least restrictive because it's a BOM protest, and their rationale for the executive order and the provisions in the executive order for enforcement, then they no longer have a defense to the First Amendment claim whatsoever. Okay, thank you very much, Mr. Ertelny. I appreciate that. Judge Manassi? Yeah, thanks very much. So, you were just focusing on the threat of arrest, but if your client is protesting, in order to disperse or other kinds of interference with her protest would also be a violation of that right, wouldn't it be? Absolutely. So, you're not only concerned about the threat of arrest, but any kind of disbursement order, any kind of interference by the state or the city with a protest. Precisely, and that's exactly the point we made in our random interoffice. Okay, I understand that. So, can I ask, so there's some back and forth about whether you're making a facial or an as-applied challenge. I guess as I read your complaint, you allege that there's a policy by the city, maybe the state, of enforcing the gathering ban on some protests and not on others based on viewpoints, and you allege that that policy is unconstitutional. If that's the nature of your claim, you're not saying there's anything special about your client that means it can't be applied to her, or you're just saying that the government can't engage in that kind of viewpoint discrimination, right, and that the policy is unconstitutional across the board. Is that right? That's correct, your honor. Right, and I understand. So, you can also think of it like you also have a challenge to executive order itself, and I guess sometimes when we evaluate the constitutionality of a statute or maybe an executive order, we say we have to determine whether it's furthering a substantial government interest, and if the government doesn't prohibit a lot of conduct that causes the same alleged harm they're trying to prevent, we might say that the order is unconstitutional. So, there's nothing as applied about that kind of a claim either, right? As far as it goes, no, that's correct. And then, so, I guess there is also the idea that if that your client maybe would be making an as-applied challenge in saying, well, they're allowing certain protests to proceed but would arrest me, and since I'm not expressing a favored viewpoint, they can't apply it to me. But even then, you're not saying there's something about your client. You're just saying that given the fact that there's some viewpoint discrimination, they can't apply it to any other viewpoint, right? Is that an as-applied challenge or is that a facial challenge? I'm sorry, repeat the question, your honor. Would that be an as-applied challenge or a facial challenge or does it even matter? Well, I would say in that description, it qualifies as an as-applied challenge, challenging the policy itself to the extent that the policy itself or the order itself embraces this viewpoint-based discrimination would be facial. But I think that from our because they will simply say that the executive order doesn't make a facial distinction between messages, but we see it as applied. So, I think you were beginning to say when you opened, it's true that the state and the city say that a lot of their participation or their statements about the protests were not an endorsement of them, but were an attempt to calm tensions. And you suggested that if that's what they were doing, it would be kind of like a heckler's veto. Are you saying the government's not allowed to agree with a message in order to calm tensions? No, I'm saying that government can agree with the message to calm tensions, but they can't groups that have different messages and make that distinction critical in their enforcement decisions. That they cannot do. Right. But the government, you know, we'll hear from the government, but the government says that they're not actually selectively enforcing the executive order. They just, because the situation was combustible and there were to stop them. And so even if they might in principle want to take enforcement action, they couldn't. And I think they say that the statements of some public officials that seem to endorse the message were part of the effort to calm tensions. I had heard you said something about a heckler's veto. I thought maybe you were saying the government can't endorse a message in order to calm tensions. But now it seems like you're saying that they could. No, Your Honor. What I began by saying is that their position in their memorandum and in the oral argument below, not as part of the factual record, is that notwithstanding the factual record, that only evidence to manifest a message-based discrimination in favor of the BLM below, their attorney speculates that the reason they made these distinctions, this license for the BLM protest, the protest notwithstanding the executive order, was out of a fear of civil unrest and historical sui generis moment in time. Yeah, but I mean, do you deny that there's some evidence that actually there were protests that were larger in scope and more spontaneous and maybe pose different public safety challenges than the protest that your client mentioned? Well, I would say this. They were certainly larger and in greater violation of the executive order. I would also say that the aspect of violence was treated through curfew and arrest. When the defendant actually wanted to address the violent protesters, they imposed a curfew. That was the whole point of the press release where the governor and the mayor came out embracing the message. But they announced, we're going to curfew because violent elements within the BLM protests were hijacking and effectively with the world's largest police force. Okay, so to ask just one other question, which is, so if we have a record that suggests the government maybe was acting with a kind of mixed motives, that there's some evidence that there was a public safety concern, but also some evidence that they agreed with the message because of some of the statements and so on. What do we do with that? Is the government allowed to act because there's a public safety justification or does the fact that there's evidence suggesting that there's viewpoint discrimination, does that trump? What do we do with a record that has some suggestion of mixed motive on the part of the government? I want to be careful though. I certainly would not concede that there's a record of mixed motive, but assuming for the sake of your question that there is, the fact remains that if they're going to respond to this threat of violence, which is every way that I can understand it, a heckler's veto, then they cannot use that as a basis to deny my plaintiff at the same time the right to protest. Then they come back and say, of course, and this is part of your earlier questioning, well, we're no longer actually arresting people. Now, let me be clear what they're actually saying. What they say, if you read their briefs carefully, is, and it's their brief, it's not part of the factual record. What they say is there have been no arrests. They're not saying we don't arrest anymore. We're walking away from- Okay, I understand that. We'll hear from them. Thanks very much. Mr. Yoshimi, I've got a few questions. First, with respect to whether this is a facial challenge or an as-applied challenge or both. I understood from the record, a colloquy between you and the district court judge, that you more or less, when you were asked whether Geller won the first iteration of this collaterally stopped you from proceeding on a facial challenge, you moved immediately to say that it was an as-applied challenge. Am I wrong or right about that? Well, I would say, I don't want to say you were wrong because I'm not looking at the transcript where you're looking or have looked. So, I would simply say that's not correct. I'm looking at 10 to 11. As the government tells me that in determining a face, this judge, determining a facial challenge, I don't look to the enforcement and you say it's a facial challenge. This is explicitly an as-applied challenge. So, it's important for us to know whether it would be a challenge here in Geller 2, which then brings up these collateral estoppel issues, or maybe you're very smart in moving to the as-applied challenge portion of this. But if it's an as-applied challenge, then I've got a few questions for you. So, tell me which one it is. In connection with this particular, what are we dealing with? You're dealing with an as-applied challenge to the extent that the executive order itself is neutral, but it's being selectively enforced based upon content and message. So, that is an as-applied challenge. That's what I thought, and that's helpful. Can you tell me, has the ban been applied to anyone? I'm sorry, has the ban? Has this been applied to anyone? Yes, Your Honor. We have on the record the case where the executive order was enforced and individuals were given citations, individuals were arrested. It resulted in litigation as a result. The very first press release where they came out and announced that the executive order would be enforced in free speech context was a result of the fact that there was a LGBT2 demonstration, and the police came and threatened the crowd, formed them to disperse and threatened them with citation and arrest. And so, we have a litany of cases. Okay. Has your client sought a permit of any sort? No, Your Honor, because a permit by my client would not be necessary. My client intended, as record establishes, 2,500 people, New York City Plaza, and that's it. As we point out in our brief, unless you're going to occupy 50% of a pedestrian area, park or what have you, you don't require a permit and they wouldn't issue one. Has she sought to engage in a protest since the change in the perspective from the government? Well, my client doesn't understand that there's a change in the perspective of the government. What my client understands, and it's the result of this litigation itself, is that the BLM protesters are given a license to protest in violation of the executive order, but the government maintains in this litigation and has consistently maintained that the executive order is stance and enforceable and valid and should prevent my client from They could have said so if they wanted to, for the record, but they haven't chosen to do so. So, I'm sorry, I'm having a little trouble understanding how, so far, this has been applied to your client who is seeking the injunction. How has the executive order been applied to your client? Well, the defendants have made it clear that they will enforce the executive order through the police memorandum and through their public statements and their actions. There is a chilling effect in First Amendment context, and the case law is clear that my client need not subject herself to actual arrest to seek review of an executive order that violates the First Amendment. So, we'll hear from the appellee's respondents. Mr. Ginsburg. Thank you, Your Honor. May it please the court. The 50-person gathering limit should not be pending appeal because plaintiff is not clearly or substantially likely to get the district court's P.I. denial overturned. Among other things, the district court acted well within its discretion in rejecting plaintiff's claim that the gathering limit as applied to her planned political protests violates the First Amendment. The 50-person gathering limit is content neutral and place and manner restriction. My friend on the other side brought up some of the statements of the defendants, including my client, Governor Cuomo, about the BLM movement, but I would start with the fact that the gathering limit by its terms applies to, quote, all non-essential gatherings, doesn't make any exceptions for any one group in the text, and those statements that my friend referenced do not create a BLM exception. He points to three statements, all of them, I believe, from the same month, June 2020, but notably, none of those statements purported to amend the terms of the gathering limit. None of those statements opined that large BLM protests are, in fact, authorized under the gathering limit, and, indeed, some of the statements affirmatively stress the importance of abiding by COVID-19 precautions when carrying out protest activity. That content neutral limit readily passes traditional intermediate scrutiny because, as plaintiff concedes, it does serve a substantial governmental interest, slowing the spread of COVID-19. The evidence shows that that interest would be achieved less effectively in the absence of the gathering limit, and I think the best evidence for that is when he notes that large gatherings present, quote, the greatest risk for rapid and widespread transmission of the virus in the community, and the gathering limit is designed to curb that. And then the last part of intermediate scrutiny analysis, the gathering limit leaves open alternative channels of communication, and among other things, some of those alternative channels include real in-person protests. Now, it's true that plaintiffs under the gathering limit cannot organize a protest of more than 50 people in a single gathering, but there is nothing—I mean, we're not encouraging her to do this, but there's nothing in the executive order stopping her from organizing a network of protests totaling 100 people, 1,000 people, whatever number she wants, so long as they are separated into discrete groups of 50 or less. So, even with respect to the precise type of protest activity she wants to engage in, as long as she separates it out into those 50 or less groups, it will not run afoul of the executive order. Justine O'Dooney. So, thank you, Mr. Ginsburg. I probably don't have that many questions for you other than I'd like to just understand how you and the city may be differently situated in this case. What enforcement authority has the state got with respect to the EO, specifically with respect to, say, Ms. Gellar's proposed protest in front of City Hall in doesn't shed a tremendous amount of light on that. I would be speculating, but I would—and the reason that I'm hedging is because I can't speak to whether, for example, there's some memorandum of understanding between the various entities that is not in this record that I'm not privy to, but I suppose in theory—I mean, as the plaintiff points out in her reply the government can command the state police, and I don't think there's anything, at least in the statute, absolutely prohibiting the state police from doing some of this enforcement activity, but the record here does not demonstrate that the state police have been involved in any enforcement activity as far as protests go, certainly as far as protests go in New York City, and in fact petitioner plaintiff in her memo of law concedes that in the context of the present case Governor Cuomo is not the enforcer, but the NYPD and defendant Commissioner Shea is. So that really reinforces our point that enforcement, where the rubber meets the road, or in this case doesn't meet the road because there has been no application yet, that enforcement is really a matter for the local law enforcement authorities. And, you know, I think that ties into our broader claim of the the fact that Governor Cuomo's statements did not create a BLM exception, because if they did create a BLM exception, what one would expect to see would be that all localities statewide take a hands-off approach to any BLM protests, and there's no data in the record, there's no information in the record suggesting that kind of statewide hands-off stepping back. And this is helpful, again just so I can understand to the extent the record may suggest that the two different defendants are differently situated here, then I understand, tell me if this is correct, that the record does not disclose in any of the for example the Butler and Katzberg and some of these other instances where early in the period of COVID and the early versions of the executive order various people were arrested or told to disperse or whatever, that was undertaken by NYPD but not by any law enforcement authorities directed by state actors? Is that accurate? It's my understanding that at least as to those events in New York City, I think some of those cases dealt with events in Albany and I'm not quite sure if some of them might have been so close to a state building that maybe there was a state police officer on hand, but to the extent that those cases deal with activity in New York, they confirm what the rest of the record suggests, which is that it's New York City doing the on-the-ground enforcement. Okay, thank you very much. Judge Nelson? Thanks very much. So the plaintiff alleges in her complaint that the city and state have a policy of enforcing the executive order in a viewpoint discriminatory way. I understand that you said that there is no such policy, but if there were such a policy, you don't deny that a plaintiff would be able to challenge it, right? If there were indeed such a policy, I mean, I suppose we would still have all of our defenses as to Governor Cuomo about 11th Amendment immunity, which we raised in our brief and we make a ripeness issue. I think Judge Nardini and his colleague with my friend on the other side brought it up sort of under the locus of irreparable harm, but the lack of enforcement of enforcement, I think we'd still have that defense, but if indeed there was content-based, if indeed the executive order on its face was content-based, I think that would present- But not the executive order on its face. I mean, it's possible that the executive order on its face is content-neutral, but that the city or the state would have a policy saying we're going to apply it only to these people and not to these other people, and if it's based on- Oh, I see what you mean. I see what you mean. If indeed there were such a policy at the state level, that would certainly make the analysis different as to my client, Governor Cuomo. If the policy only existed at the local law enforcement level, I think the considerations might be somewhat different, but- Yeah, but I'm just pointing out that that is a claim that somebody could bring. Sure, absolutely. Yeah, I'm sorry, Your Honor. And so in this case, right, so the plaintiff alleges different treatment on the basis of between her protest and the protest that happened in the wake of the George Floyd shooting, or sorry, the George Floyd incident, that when she filed her first complaint, that incident had yet to occur, right? She filed her first complaint, I believe it was June 10th, and if memory serves, that incident occurred in late May. Oh, so it was after, but was there an allegation, but her- the claim in Geller 1 was that the order just wasn't justified, right? There hadn't been all of the protests, or perhaps your claim- I'm sorry, Your Honor, I think I misunderstood your question. I was referring to her complaint in this case. Her complaint in Geller 1- Yeah, of course, in Geller 1. Oh, I see. Her complaint in Geller 1, I do believe, was filed before the George Floyd incident. Before, right. Yes. Okay, so if in fact she is now saying that there is a viewpoint discriminatory enforcement policy, she couldn't possibly have made that claim in her first complaint, in Geller 1. Yeah, I see where you're going, Your Honor, and I agree with you on that. I think our point is going back to my earlier colloquy with the court that none of these statements that plaintiff holds out as creating a BLM exception to this- Yeah, that's fine. No, I want to ask about that too, but I just want to clarify that there's no way that she's stopped from making this claim because she couldn't possibly have raised it in her first complaint. Yeah, I mean, she could not have raised the BLM exception based on the Floyd protests. Right, and this idea that there's an enforcement policy. And when you challenge such a policy, her claim is not that there's anything special about her. That means that the policy can't be applied to her specifically, it's that such a viewpoint discriminatory policy is on its face unconstitutional, right? I mean, as I understand it, that's one of her claims. And in terms of a likelihood of success on this motion, I heard her colloquy with Judge Lohier is saying that she's bringing an as-applied challenge. I do think this is a kind of case where the reasoning the court might employ in accepting or rejecting her challenge might look very similar regardless of whether it's facial or as-applied. But strictly speaking, as I to her. Oh, well, of course. I mean, every plaintiff seeks relief as to themselves. That doesn't mean that... Okay, I get it. Okay, I understand your position. So can I just move on to this question about whether there's an exception? So your position is that Governor Cuomo's statements did not create what you call a BLM exception as the executive order. So Governor Cuomo's position is that all of the protests that happened in the wake of George Floyd and those related protests, those were unlawful. Is that right? Well, the executive order does not authorize the protests. I think I do want to be very careful about this. There's a question. There's one aspect of this that hasn't quite been litigated in this case, which is whether some of those protests are even gatherings at all, to which the executive order applies. The word gathering is not defined in the executive order, but the state has always understood it to mean people who arrive to an event together, leave together, spend time together in a coordinated way while they're there. Some of the very early George Floyd protests, as I understand it, were more of these spontaneous outpourings. So I think it's an open question. It hasn't yet been litigated whether those constitute gatherings. That's fair enough. So to the extent that they're organized in advance, you're saying that they violate the executive order, but perhaps the spontaneous protests would not. That's your position, at least. I think that's fair, Your Honor. Okay. And so if Governor Cuomo's position is that the protests were in violation of, or at least those protests were in violation of the executive order, and you're saying his statements, I support the protests and I support the protesters, which is what the plaintiff alleges. Well, I think the reason he made the statements is because that was indeed his view. He supported the message, the underlying substantive message of the protest. He supported the sort of larger general notion of seizing this moment. But there's nothing in any of the statements that is a clear statement purporting to interpret the executive order, purporting to create any sort of exception. And I think I would have a hard time doing better than the Seventh Circuit did in the recent Illinois Republican Party opinion that it issued earlier this month, where it confronted similar statements on behalf of the Illinois governor. And it found that those statements, because they were, quote, untethered to any legislative or executive rule making process and didn't purport to carve out exception. But do you disagree with the plaintiff's protest occurred and the executive order was not enforced against them to require them to disperse or to make an arrest? That's what appears to have happened. I mean, I think that question would certainly be more in the bailiwick of the NYPD and the local law enforcement who are the principal people involved in making these enforcement decisions. But that, you know, enforcement decisions, that is why they are left to local law enforcement. The local law enforcement can assess the situation on the ground. Is it too combustible? Do they need to hold back? Should they be more aggressive? That's fair enough. But so if Governor Cuomo were in charge of the local police force that was making the enforcement decisions, it would be, would it be a different question if the evidence suggested that the order was not being enforced against the protesters and the head of the law enforcement agency said he agreed with the protesters? We see why that why that creates that issue. It would be a somewhat different question. I think if hypothetically Governor Cuomo were stepping in the shoes of those local law enforcers, he too would have that sort of local law enforcement by hypothesis discretion and he too could make case-by-case analysis of whether and when enforcement would be appropriate for reasons having nothing to do with the message just because of spontaneous combustible situations and the like. But the governor is involved in some in some enforcement, right? The governor had to approve the curfew that happened, right? So sometimes the governor coordinates with the city in terms of what their response is going to be. Isn't that right? There's certainly some coordination. Absolutely. Although I don't think the record bears out any coordination in terms of the enforcement of the 50-person gathering limit. But in general, yes, the New York City and all of our other municipal, all the other municipal partners often work with folks at the state level including the governor in presenting. So you said you said during your comments that Ms. Geller can't organize a protest of more than 50 people. So you're not saying that this is not being enforced. So your position is if she were to go and begin a protest of 50 people or more, it would be unlawful and should be ordered to disperse and or arrested? No, your honor, that's not my position. I was simply commenting on those actions vis-a-vis the terms of the executive order. Whether those terms would actually be, to use Judge Sutton's words in the ripeness case that we cited, liquidated into an enforcement action, that would be up to the NYPD. And I on behalf of Governor Cuomo am not making any representation one way or the other on that. I am simply saying that it is true that that her planned protesting activity would not be authorized under the 50-person gathering limit. So the state would leave it up to local law enforcement to make a particular decision, but the policy of the state would be that that gathering would be or that protest would be enforced. The state doesn't say, okay, there's this woman named Ms. Geller. She's come in and wants to do this protest. Are we going to enforce it or are we going to leave it up to NYPD? Writ large, these matters are left up in general to the NYPD. It's not like the state is picking out Mrs. Geller and somehow removing itself only from that situation while maintaining close involvement in all other situations. I understand. You're just saying there's no reason to believe that. I just want one last question. So on the public interest prong, you say that there isn't a public interest in allowing her to protest, but if there are all of these other ongoing protests, what would be the difference with one additional one that the plaintiffs here would organize? First of all, I don't think she's just been talking about organizing just one. As I understand it, she sought to organize multiple protests over the course of this past summer and perhaps in the fall. But I think we can look to recent events in the news to see what the consequence of holding just one of these types of events might be. I mean, think about the wedding that recently occurred in Maine, which only exceeded 50 people by about 10. I think it was 62 or 65 people. Last I checked, that wedding has been responsible for seven at least coronavirus related deaths and over 150 confirmed cases of coronavirus. So events like that underscore constitutional deference to the state in enacting these sorts of executive orders and leaving the on-the-ground decisions of when best to enforce them to local law enforcement. Thank you. Mr. Ginsburg, just very briefly, would you respond to the chilling argument that Mr. Yerushalmi made? Well, I think the chilling argument, as I understand it, would go more under the rubric of irreparable harm in that she would be dissuaded from exercising her First Amendment rights. We're not contesting irreparable harm. That's pretty much a given in these First Amendment cases, at least as we understand this court's jurisprudence. But I don't think that chilling effect would be enough to get out of a ripeness challenge. Oh, that's where I'm heading. So would you tie that into the ripeness challenge, to the ripeness defense that you've discussed in your briefing? Sure. Well, the ripeness defense does not advance the position that Ms. Geller cannot bring any constitutional challenge to this limit before it's enforced. And this court's cases don't stand for that proposition. But what they do stand for is the proposition that if she's going to bring a pre-enforcement challenge, except in very limited circumstances, that has to be a facial challenge. So had she brought a facial challenge to, I mean, she brings a facial challenge, had she moved for her injunction pending appeal on the basis of her facial challenge, then I think we would not be making that ripeness claim. But because she has moved for this injunction based upon her as applied challenge and has not purported to defend her facial challenge, her claim is unripe. And remember, the gathering limit, if we're talking about a facial challenge and whether the gathering limit would be valid as applied in other circumstances, the gathering limit applies much more broadly than just protest. It applies to all gatherings. It applies to parties, barbecues, the like, things that aren't traditionally associated with the same First Amendment pedigree. And the plaintiff only discusses the constitutionality of the 50% limit as applied to protest. I don't understand her to be making any sort of broader claim for the purposes of this motion. So that's the reasoning behind our ripeness claim. Thank you. We'll hear from counsel for Mayor de Blasio. Good afternoon, Your Honors. Ashley Carmen on behalf of the municipal affiliates. The fundamental problem with plaintiff's claim of a selective, of being selectively enforced viewpoint discrimination and a policy of viewpoint discrimination is that she is latching on to the political speech of a public official who is faced with lots of different considerations, speaking to lots of different constituencies during historically fraught circumstances. And, and it's trying to draw a line from that political speech to enforcement on the ground. And we submit that that is not an appropriate line to draw. What's more appropriate is to look at the enforcement efforts that are going on the ground. And as we explained in our papers, the situation facing the city, following the killing of George Floyd, created a fundamentally different public safety challenge that required officials on the ground to make decisions about how to deal with a very fraught and combustible situation. And, and Your Honors had asked about, you know, what to do if there is, what do we make of a record of mixed motive? If at the very most, plaintiff's emphasis on Mayor de Blasio's statements and actions, expressing support for the message of the protest, that perhaps that may raise a question, but what it is plaintiff's burden to show a clear entitlement to release here. And we would submit that she has not met that burden if there, if there is even arguably a record of mixed motive, because as we laid out in our papers, there are fundamental legitimate reasons unrelated to the content of viewpoint or content that necessitated a careful and different response to the George Floyd related protest. Judge Nardini. Yeah. Thank you, Ms. Carmen. I have a few questions for you. Let me start with the question I was raising earlier with your opponent, which is, if you could clearly state to me, what is the present policy of the city with respect to enforcement of the executive order? If Ms. Geller were to show up at city hall tomorrow with, I don't know, 75 people, assuming that she were to otherwise comply with the law in every other respect, peaceful masks, six foot distances, you know, not blocking public spaces, whatever other violation of law you can imagine they're not doing so that the only hypothetical violation would be of the executive order. Can you make a representation as to whether the city would take adverse enforcement action against her or not? I cannot take that, make that representation, your honor. All I can say is that, um, as, as was observed before, since, um, the George Floyd killing, there have not been any arrests of any protesters for any message, um, solely related to the gatherings restriction. Um, any arrests that have been made, uh, have been little because there have been other, um, crimes or violations observed. Um, but I cannot make that representation that if she, if Ms. Geller, uh, went out to protest tomorrow with a group larger than 30, that, that there would be no enforcement action taken. So, so let me follow up on that because I had thought that the reason you were in the district court pointing to this evidence of I'll describe this uniform non-enforcement of the executive order, uh, post Floyd was to show that she does not in fact face a danger or any likelihood or however you want to phrase it of an enforcement action. I mean, isn't that the point of why you put that evidence in the record or was there some other purpose other than to show she was unlikely to be subject to enforcement action? You're right. I mean, I can't speak to why the particular attorney for the city made that statement, but my understanding is that the, um, so then why is it projected to us? Why, why, why would that matter to us in the least then? Because for, uh, for protesters and connecting with black lives matter protests versus protesters. Ms. Garman, Ms. Garman, this is just Lilia. You're breaking up at least, uh, for me. So I can't, I can't hear you. Well, I do apologize. I do not have the best connection. Um, is this better? Yes. Um, so, so I mean a significant, that, that piece is relevant to the fact that there is, there's no evidence that the black lives matter message has been favored over any other message. Okay. Well, let me, let me, let me probe that a little bit. It seems to me then, but you're still drawing a temporal line, right? You're saying that once those, uh, protests began, there's been no enforcement, but the record seems to indicate that beforehand, there were enforcement actions taken, including, I think the evidence is against some people who were right. Uh, I think that's right. I mean the evidence, I believe they were in this record, they are, um, complaints, um, you know, allegations and lawsuits. Um, well, sure. I mean, but here we are, we're just at the preliminary injunction stage and there are inferences that can be made, right? This is not, uh, you know, a final judgment on the merits, right? So we're, we're looking at all the allegations and we can certainly look at that, right? Yes, your honor. I would, um, I would, uh, it's not a perfect comparison because I think the world really did change after, um, after Mr. Floyd's death. And in addition to, um, you know, the, um, the movement or reinvigoration of the movement that his, his death sparked, the, uh, that we were in a different place in terms of the gathering restriction at the time of, um, the complaints that Ms. Geller cites, I believe that the, in fact, I know that the, it was a full on gathering span and there was not, um, you know, a 10 person or a 50, now 50 person limit. Um, and also we were in a different stage in terms of New York city, um, you know, so sort of being at the epicenter of the COVID-19 pandemic. So I think especially because, um, the rapidly changing circumstances, both with respect to the pandemic, um, in, in New York city and the, um, the general, um, state of the world that changed following George Floyd's death, I think, I don't, I don't think that it's an appropriate comparison. Well, then let me turn to a couple other things. I'm not sure I understand them because if you're trying to draw a temporal line between before and after the Floyd, uh, protests began, um, I don't understand then why you're, you seem to be holding out the possibility that there could very well be all sorts of enforcement now against Ms. Geller, even though we're on the other side of the line, right? Is your view that the world has changed back and we're not in whatever this moment you're saying is different from the early stages. I mean, are you saying that the city is across the board going to be enforcing this, uh, more tightly now? I guess I'm trying to understand if you're trying to draw a line between before and after, then why are we not just in the world of after where there's lax enforcement? I'm not, I'm not certain that I understand your question, your honor. I, I'm not saying, I'm not saying that there is going to be, um, reinvigorated or more aggressive enforcement. Now, um, all I was saying is that we cannot, um, you know, I am not in a position to make a representation that if Ms. Geller, um, violated to hold the protest in violation of the gathering restriction, that enforcement will not happen. I'm just, I'm not in a position to make that things are going to change in the other direction. If anything, um, again, I mean, the entire response to the COVID-19 pandemic necessarily has been, um, you know, rapidly changing based on newly acquired information and the trend with respect to the gathering restrictions has been, um, you know, uniformly loosening, um, the restrictions. All right. So, so maybe if I'm capturing, I understand that you don't want to make a could come back to bite you in the future, but I mean, maybe what I'm hearing you say is if we're going to look at the record, we'll have to make predictions about future enforcement based on what's been happening lately, but you can't make any promises about what's going to happen in the future. Is that sort of what I'm, you're trying to say or. Yes, your honor. Okay. Well, let me ask you then about the substance of the selective enforcement claim. One of the questions I had is we're in the factual record before the district court. Does the justification appear for the city that they were, you know, coming up with various policing approaches that were, um, aimed at, uh, trying not to escalate the situation, trying to not to avoid, you know, trying to avoid, uh, provoking violence. I saw that at the end of oral argument before the district court, some representation, some arguments made, uh, by, uh, the city, but does that appear in any of the, I don't know, any of the declarations that anybody put in there about that or, or no, I may have missed it. It may be there and it'd be helpful if you could direct me. Uh, yes, your honor. Um, no, I mean, below we did not, uh, take a, we filed a response, but we did not take a position, um, in the, in the papers that we filed below. Um, and so that, um, your honor is correct that that information came, um, through at the preliminary injunction hearing where the judge, uh, the district judge several times, um, you know, from the city's attorney, um, to make representations and to make those explanations. So that was sort of a, it was an argument if I understand, but there's no actual evidence in the record that that was actually what motivated any decision makers, uh, in this case, right? That's correct. Okay. Um, can I address or ask you to address one of the arguments and maybe it's also one of the ones that was only, uh, offered as a justification in argument and not in any actual evidence, which was, uh, that there's no differential treatment because what Ms. Geller is proposing to do is in organized event. That's not a lack of enforcement in recent days, the city alleged there's argued, um, is against non-spontaneous, uh, groups or non-spontaneous events that are not organized in advance. And that might, you know, if pushed, uh, turn violent or somehow go bad. Um, there's evidence in the record, I believe about, for example, the mayor participating in the painting of a mural on street in Manhattan. Is that correct? Uh, yeah. So does that incident, how does that fit into the city's argument that the non-enforcement has been motivated by a desire, uh, not to apply enforcement techniques to spontaneous unorganized events. Well, your honor, I don't know. That goes back to Ms. Geller trying to make a leap from political speech and political actions of a public official, um, who, no, no, no, no. I'm not even talking about whether there's any, uh, agreement or non-agreement that was stated at the event. Um, the event happened though, right? There are a number of people in the photo who are gathered at that time, who exceeded, by my count, just kind of people in the photo exceeded the gathering maximum at the time. And let's put aside what they were meeting for, but the mayor was there, right? It was publicly meeting. So whatever the message they wanted to send doesn't really matter, right? Because it seems like that was a non-spontaneous and yet organized event. And I guess my question is if that, if that's evidence in the record, then why should the court credit an argument not supported apparently by any evidence in the record, no declarations, that one of the motives for differential treatment here was, you know, a desire not to apply enforcement actions towards spontaneous unorganized events? Well, your honor, I don't think that you can divorce that one event from the larger context of the unique historical circumstances in the aftermath of Mr. Floyd's death. I think that the context here matters. And that's what's in the record about that event is in the context of that is a statement by, that is part of a politician's response to heal a community. And I think at the end of day, it is Ms. Geller's burden to show, to make a clear showing that the response to the George Floyd related protests was motivated by the message and the extent that a single event and a single painting of a mural that is very much enveloped in the overall context may raise a question, but it certainly does not suffice to make a clear showing of some sort of policy of saying one message over another. Just know, DeeDee, can we, let me move on to Judge Manasci and then if you want to ask more questions. No, no, no, that's for me. Judge Manasci? So if I just heard you right on this last statement, you said that the fact of painting the mural and expressing support for the protest raises a question as to whether there is differential treatment on the basis of viewpoint. You just don't think it's clear enough to entitle the plaintiff to an injunction. Is that right? I'm saying it, at most, it could raise a question, but that's not the plaintiff. If you're saying that there is evidence where one could infer that there is a policy of allowing some protests and not others on the basis of viewpoint, you just don't think the at this time. Well, I don't think, I mean, I don't, I don't believe that that event could be characterized as a protest, but certainly, well, but certainly the slogan is associated with certain protests and those are the protests that were not being subject to, made subject to the executive order, right? So it is some evidence of agreement with the viewpoint and you can make an inference about the status of the protest. Also, I think I showed you our meeting was pointing out that the mural gathering was itself a gathering to express a certain viewpoint, right? Yes, but we would submit that it is not, it is not sufficient to make out, to me, plaintiff's burden of persuasion for not just an injunction, but a mandatory injunction. Can I just go, can I back up a little bit? So your brief says that Ms. Geller has never had interactions with the police and there haven't been arrests and so on. And the suggestion in the brief is that it's speculative as to whether the city would actually enforce the ban on to Ms. Geller if she were to have a protest. But you're here representing the city and I take it that in response to the question, would you enforce the ban against her if she were to have a protest? Your answer is you might, right? My answer is that I can't, I cannot represent that she would not. Okay, so on this record, so on this record and like you as a representative of the city, seems like she very well might be, because you can't say that she wouldn't be, right? Is that, I mean, that's just what you said, right? So, so then, so then what, let me, let me, let me just hear the, can I just ask you Ms. Geller's answer to that question? Yeah. Oh, I'm, I'm very sorry. It is a possibility. Yeah. Okay. So would it be reasonable for somebody in Ms. Geller's position who wants to have a protest to cancel those plans because there's a reasonable, credible possibility that she would be arrested or otherwise there'd be enforcement action taken against her if she were to go forward with her plan? Well, I, I, I can't speak to what would be reasonable for her to do, but it goes to another issue, which is that she has not ever, her, her, she's, despite this being her burden to make a clear showing of entitlement to release, the sole proof that she has put forth really is nothing. Yeah, I know the political statements. I'm not, I'm not talking about the political statements. I'm just asking about a basic question about, you know, ripeness and standing. So it seems like based on your representation, anybody who would want to have a protest that involves 50 or more people probably would decide not to do that because it seems pretty likely that they would be subject to some kind of an enforcement action. It would be a reasonable, it would, it would be a prudent decision, but Your Honor, I, I. Right. So just, just, just, just somebody in that position, do they actually have to go forward and do it and get arrested before they're able to challenge a prohibition on First Amendment activity? Haven't we said as long as there's a credible threat of prosecution that that's enough? Yes, Your Honor. Our point is more that in terms of her selective enforcement claim, she did not in the first instance, identify a, a, a, a comparator for whom she, the gathering restriction was enforced differently. No, no, I understand. So you're saying that you don't think that there actually is a policy of enforcing it differentially on the basis of, of viewpoints, but, but if there were such a policy, and I put this question to the attorney for the governor too, she could challenge that policy. Nothing would stop her from doing that. You just think she loses on the merit. That, that's correct, but she has not put any proof, any specific proof, other than a vague description of protests that she, that she of 25 to a hundred people that would have organized had the gatherings restriction not been in place. She hasn't put in any meaningful showing that she was even able or planning or capable of having more than 50 people attend a single protest. And so in that respect, the, the, the, the, it's further speculative that there would be any enforcement action taken, not even meaningful showing of. It's speculative, speculative, not because there's a credible threat that there'd be not sure she'd be able to get 50 people together. I think it's speculative for both reasons, but she is not really, she's, she's advanced only the most nebulous showing. Can I ask this other question? So you say in your brief, the statements of the mayor are best understood to reflect recognition of the protest inevitability, right? So does that mean that the mayor would have wanted to disperse the protests or stop them, but expressed support for them because he recognized that they were going to happen nevertheless? Your Honor, I can't speculate as to the mayor's personal motivations for comments that he's made, but what the point is, is that, well, could you explain this argument, this idea that the statements are understood, are best understood to reflect recognition of the protest inevitability and not an endorsement of them? Isn't that your argument? Your Honor, the statements were clearly supporting the general message. That is different than saying they were encouraging people to come out on that and protest. And what we mean by um, noted, the, the quickly, it quickly became clear after Mr. Floyd's death. I understand that. So you said it's not encouraging people to come out and protest. So if in fact the mayor had made statements encouraging people to come out and protest, would that be a different case? And would that show viewpoint discrimination? I think it would be a, it would be, it would be a closer case, Your Honor. But again, I don't know that a politician's speech in a time where the, the, the, you know, the, the history and pain and anger underlying the protest was, was, was, well, when you say that, what makes the protest different is the history and pain and anger underlying them. Aren't you saying that they were addressing an issue that was very important, right? Is that what you're saying? No, I'm, I'm not. I'm, the, the statements made by the mayor have to be understood in the context of the, the, the larger context of the inevitability of this outpouring, as, as the district court put it, an immediate spontaneous outpouring of righteous anger that reverberated around the globe. And in responding to such a situation, the mayor, as the leader of the city, made certain comments that cannot be divorced from that, from that overall context. When you say it can't be divorced from the overall context, I mean, what does that mean? So the context in which the plaintiff wants to put it is there were these protests that occurred that the city allowed to occur, even though it had ostensibly a ban on gatherings. And because the mayor, who's in charge of enforcing that in the city, endorsed them, that it seems that it was made on the basis of viewpoint. So what is the additional context that is missing? You keep saying it has to be understood in context. What's the context that changes the way the plaintiff has framed it? The context is, the way the plaintiff has framed it is that the statement by the mayor caused enforcement actions, or the non-enforcement, as it were. And that's not, that's an inappropriate line to draw. Oh, I see. So you're saying that the mayor might, I mean, I guess that's reasonable. You're saying the mayor might very well have gone in front of the cameras and said, I support the protest and the message, while at the same time, you know, in private, telling the police that they should treat the protest the same as any other gathering. That's what you're saying? And so we shouldn't read too much into the public statements, because he might have been doing something very different in private. I'm saying, certainly, we shouldn't read too much in front of the public statements, and there's no... No, I still have more questions. So it's not just that they were public. Okay, but Judge Menachie, I'm going to have to leave. Okay, well, let me have a couple... Okay, okay, great. Okay, so just, you're saying that they're public statements, but the plaintiff added to her complaint pictures of public officials participating in the protest. Isn't that an action that's different than a politician's public statements? Why doesn't that convey a position that the protest should be occurring? For the same reason as the speech does not, the action is a symbolic action, and it is a response to a particularly fraught, delicate situation in which the motivation behind the protest is... All right, I understand that. So I have one last question, which is, I think at the beginning of that, maybe the city did agree with the protest or did agree with its viewpoint, but it also had other public policy reasons why it would treat the protest different than other ones. Is that what you said? I did say mixed motive. That was in response to a question that I believe had been asked. Right, but you agree that the record here shows that. Is that right? I would agree that the record shows the mayor expecting support for the message, and could that raise questions about the motive? Yes, it could raise questions. Does it make a clear showing and carry the burden of persuasion? No, it does not. All right, thanks very much. Okay. Very briefly, because Ms. Yarma, I've got to move on to something else after this argument, but let me just make sure I understand, because you said a lot of different things, and it sounded like a lot of confessions, and it did not sound like you understood the theory of your case exactly, frankly, but are you saying that there is a record of a credible threat of arrest or prosecution of Ms. Gellar? No, I'm not saying that there's a record of a credible threat of prosecution. What I said was that I cannot confirm that she would not be arrested or that there would not be enforcement action taken. I don't know where you are in the pantheon at the Corporation Counsel's Office, but is that something that the Corporation Counsel, if I were to ask him, would say, yes, I cannot guarantee, I cannot say that she will not face any sort of prosecution, or is that something that you're personally uncomfortable saying at this stage? I, that the City's position is that we cannot assure Ms. Gellar that she will not be subject to enforcement. Although the City's position, or the City's statement has been over and over again, as I understand it, that as a matter of fact, there's a carve-out for all as a matter of fact, there have not been arrests made solely for violation of the Gathering Prohibitions. And so I take it your point is, look, this is a preliminary injunction. Ms. Gellar has got the burden, and there's at least equivocal record of evidence of mixed motives in one case of any threat of prosecution, and that's not enough. Is that the argument? Is that really the argument? The argument is that Ms. Gellar has not made a clear showing of entitlement to an injunction here, because she has not demonstrated that there is any, that she has been treated differently based on viewpoint. And if there were to be, if we were to grant an injunction, let's just say hypothetically, you know, she's looking for, I think, a full-on injunction. Is there something short of that, that we could grant? More limited in scope than a full injunction. I'm not entirely sure what your Honor means by a full injunction. I mean, I would submit that at the very least, she has not demonstrated that an injunction is in the public interest, and that if there, even if she had shown a likelihood of success on the merits, that the injunction in this particular case is not the appropriate remedy. What is the appropriate remedy? That's my question. Well, she has asked for nominal images in her complaint, and I think, I, at this point in time, she has ample alternative means to express her message. She may hold a public protest at her desired location, City Hall Plaza, within her desired size range, 50 people, up to 50 people, fairly within 25 to 100 people. You know what I would like? You know what I would like? I would like a letter from the City, and by tomorrow at 5 p.m., either confirming or refuting your statement that you can make a representation about what might happen, or what would happen to Ms. Geller, Ms. Fio, you'll have another 24 hours after that letter to respond. Very short, you know, three pages, double speech each. Is that fair? Yes, Your Honor. Ms. Fio, is that okay? Yes, Your Honor, thank you. All right. Is there anything further, Judge Nardini or Judge Manasseh? No, I just want to thank you. I'm sorry for the time crunch. No, that's fine. Judge Nardini? No, but thank you to counsel. It was very helpful today. Yes. Thank you. The motion is submitted, and we'll reserve the decision. Thank you all.